IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ALICIA VELAZQUEZ-VELEZ, et al.,

   Plaintiffs,

        v.                         Civil No. 15-1126 (SEC)

CARLOS MOLINA-RODRIGUEZ, et al.,

   Defendants.

## OPINION & ORDER

In this political discrimination action, several transitory employees of the Municipality of Arecibo (the Municipality) allege that their employment contracts were not renewed due to their political affiliation with the Popular Democratic Party (PDP). These Plaintiffs are currently represented by six attorneys from the law firm of Aldarondo & López Bras (ALB).

Defendants move the Court to disqualify ALB and its attorneys from further participation in this case.[1] For the following reasons, Defendants' motion is **GRANTED**.

### I. Background

From 1998 to 2013, the Municipality regularly executed year-long contracts for legal services with ALB. See Docket # 53-1. During these years, the Municipality's administration was spearheaded by the New Progressive Party (NPP). Between 2001

---

[1] ALB does not challenge Defendants' contention that the disqualification of any of these attorneys must be imputed on the rest, such that the entire law firm would be disqualified. Accordingly, the Court shall use "ALB" as a placeholder for both the individual attorneys and the law firm itself.

and 2005, however, no contracts were executed because the Municipality's administration at that time belonged to the PPD.

Over the years, ALB provided the Municipality with a wide gamut of legal services, including representation before state and federal agencies and courts. See Docket # 53-2. The record shows that ALB has defended the Municipality against various employment discrimination and civil rights lawsuits filed in this district. See Id. Indeed, three of the attorneys representing the Municipality in those cases also appear as attorneys of record in this case.

The relationship between ALB and the Municipality soured, however, in 2013. In the primaries, Carlos Molina defeated the incumbent NPP mayor Lemuel Soto for the NPP's nomination to the Municipality's mayorship. Molina later won the general election and became the Municipality's new mayor. For reasons that are undisclosed on the record, Molina quickly axed ALB as the Municipality's legal representatives. ALB stopped rendering legal services to the Municipality in early February 2013. The next month, ALB filed a collection action against the Municipality related to legal services rendered the preceding year. ALB won that case, and judgment was entered in its favor on February 26, 2014.

Fast forwarding to the present day, the Municipality now moves to disqualify ALB from this suit on grounds of conflict of interest. Specifically, the Municipality contends that its lengthy history with ALB, coupled with its previous representation of one of its officers named as a co-defendant in this case, placed ALB in a position to gain confidential information relevant to this suit. ALB demurs.

## II.     Discussion

The Court is mindful that "[d]isqualification during pending litigation is an extreme measure." In re Cendant Corp. Securities Litigation, 124 F. Supp. 2d 235, 249 (D.N.J. 2000). Accordingly, this type of request must be approached with "a keen sense of practicality as well as a precise picture of the underlying facts." Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB, 944 F.Supp. 341, 345 (D.N.J.

1996). A dash of skepticism is helpful, too, since disqualification may sometimes be sought as a tactical measure "designed to harass opposing counsel". Fiandaca, 827 F.2d at 831.

   a. Defendant's motion is timely

From the outset, ALB argues that the motion to disqualify should be denied as untimely. Courts in other circuits have held that delay is sufficient to deny a motion to disqualify, see e.g. Redd v. Shell Oil Co., 518 F.2d 311, 315 (10th Cir. 1975). However, the First Circuit has taken a more lenient tack, stressing that "the need for upholding high ethical standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion." Kevlik v. Goldstein, 724 F.2d 844, 848 (1st Cir. 1984); Fiandaca, 827 F.2d at 830. If "disqualification is in the public interest, the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of [an ethical breach]." Id. (citing Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1978)). The denial of disqualification on the basis of untimeliness is proper, however, if "it can be shown that the movant strategically sought disqualification in an effort to advance some improper purpose." Fiandaca, 827 F.2d at 830–831.

The "great majority of cases where motions to disqualify were denied as untimely involved motions filed on the eve of trial." Records v. Geils Unlimited Research, LLC, No. CIV.A. 12-11419-FDS, 2013 WL 3967970, at *3 (D. Mass. July 30, 2013). In comparison, the delay involved here is nowhere as egregious, as Defendants filed their motion near the start of discovery. Moreover, there is simply no concrete evidence showing that Defendants had any "improper motive" in seeking to disqualify ALB. Southwire Co. v. Ramallo Bros. Printing, Civil No. 03-1100 (GAG), 2009 WL 4937726 at *6 (D.P.R. Dec. 15, 2009). Defendants apprised Plaintiffs that conflicts of interest might become an issue later on in the case and made no effort to conceal their hand. Finally, as discussed in further detail below, Defendants' request is meritorious. For these reasons, the Court finds that the motion is not untimely.

b. ALB has disqualifying conflicts of interest

In this district, the standard for attorney conduct is set by the Model Rules for Professional Conduct issued by the American Bar Association (the Model Rules). See Local Rule 83E(a). Model Rule 1.9(a), in particular, provides as follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

In conflict-of-interest scenarios, the relevant question is whether the attorneys under examination could have "obtained confidential information in [a prior] suit that would have been relevant to the [pending suit]." Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 439-40 (1st Cir. 1991) (citing Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263, 1266 (7th Cir. 1983)). The Court may also inquire whether the attorney gained confidential knowledge concerning the previous client's procedures and policies. While this "playbook" information "is not in itself cause for disqualification," it may factor into the decision to the extent it is relevant and gives the non-moving party an "unfair edge" in the litigation. See Charles W. Wolfram, Former Client Conflicts, 10 Geo. J. Legal Ethics 677 (Summer 1997); see also Comment 3 to Model Rule 1.9 ("[G]eneral knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.").

The burden of proof on a motion to disqualify belongs to the movant. For this purpose, naked claims that the attorney received confidential information from his prior (and now adverse) client do not suffice. Rather, "the moving party must allege the type and nature of the confidences that were exchanged in the prior litigation that should subsequently disqualify the attorney in the latter representation." Starlight Sugar Inc. v. Soto, 903 F. Supp. 261, 266 (D.P.R. 1995). This is a nuance that merits

some clarification, especially in light of ALB's insistence that Defendants have not met their burden of proof here. According to the commentary to Model Rule 1.9, a "former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter." Model Rule 1.9, Cmt. 3. Indeed, such a course "would result in the confidentiality of the information being lost in the very process of attempting to protect it." Starlight Sugar, 903 F. Supp. at 266 (D.P.R. 1995). Instead, a "conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." Model Rule 1.9, Cmt. 3.

Model Rule 1.9 "exists for the purpose of preventing 'even the potential that a former client's confidences and secrets may be used against him,' to maintain 'public confidence in the integrity of the bar,' and to fulfill a client's rightful expectation of 'the loyalty of his attorney in the matter for which he is retained.' " See Madukwe v. Delaware State Univ., 552 F. Supp. 2d 452, 458 (D. Del. 2008) (citing In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 162 (3d Cir. 1984)). Thus, "[w]hile the party seeking disqualification bears the burden of establishing the existence of a 'substantial relationship,' any doubts about whether disqualification is appropriate should be resolved in favor of the moving party, in order to ensure protection of client confidences." Id. (citing INA Underwriters v. Nalibotsky, 594 F.Supp. 1199, 1207 (E.D.Pa. 1984)).

Courts have used the following three-step test to determine whether the attorney was indeed in a position to receive such disqualifying information:

> First, the court reconstructs the scope of the facts involved in the former representation and projects the scope of the facts that will be involved in the second representation. Second, the court assumes that the lawyer obtained confidential client information about all facts within the scope of the former representation. Third, the court determines whether any

>   aspect of the former representation is so similar to any material matter in the latter representation that a lawyer would consider it useful in advancing the interests of the client in the latter representation.

Starlight Sugar Inc. v. Soto, 903 F. Supp. at 265–66 (citing Charles W. Wolfram, Modern Legal Ethics § 7.4 at 370 (Practitioner's Ed. 1986)).

There is not much dispute concerning the scope of ALB's prior representation of the Municipality; in a nutshell, it was as broad as it gets. As ALB admits, it provided a smorgasbord of legal services to the Municipality and its officers for a large part of the past two decades. This included representation before federal and state courts, administrative forums, and legislative processes. ALB also provided advice concerning "any other matter delegated." See Docket # 57-1.

Moving from the general to the specific, the record reflects that ALB defended the Municipality against various lawsuits filed in this district. In support of their motion, however, Defendants focus on just one of these cases: Oquendo-Maldonado v. Municipality of Arecibo, Civil No. 07-1145 (DRD). The legal and factual issues in Oquendo bear many similarities to this case. For instance, both cases involved non-policymaking public employees and PDP supporters claiming political discrimination at the hands of an NPP administration. Also, they share a common plaintiff and defendant. Specifically, Angel Oquendo-Maldonado (Oquendo) was the named plaintiff in the case before Judge Dominguez, and was also a plaintiff here.[2] Mr. Hiram

---

[2] Co-plaintiff Oquendo recently moved to dismiss his claims against Defendants with prejudice, the timing of which is somewhat suspicious given the close proximity to the motion for disqualification. Also curious is that, at the summary judgment stage in Oquendo, ALB argued on behalf of the defendants that "Plaintiff Oquendo routinely change[d] his political affiliation in order to assert claims of political discrimination against the party currently in power in Arecibo." Oquendo-Maldonado v. Municipality of Arecibo, Civil No. 07-1145 (DRD), Docket # 137. This allegation stemmed from the fact that plaintiff Oquendo had participated in a political discrimination case filed in 2001 where he claimed that members of a NPP administration in Arecibo had discriminated against him because he was a member of the PDP. "Ultimately, Plaintiff Oquendo received a settlement award in that case, which was disbursed during the administration of Defendant Mayor Soto, a member of the NPP, between 2005 and 2006." Id. In the case before Judge Dominguez, Oquendo made an about-face, and claimed he was instead a NPP member subjected to discrimination by the PDP administration. Given this history, the Court finds it eyebrow-raising that ALB would place its stamp of approval on Oquendo's claims here.

Cruz-Gonzalez (Cruz), on the other hand, was sued in his official and individual capacity in both cases, where he was charged with being a major player in the discrimination alleged. In Oquendo, Cruz is alleged to have participated in various actions constituting political discrimination against the plaintiffs (including Oquendo) – for instance: failure to assign work, the suspension of a co-plaintiff's employment, subjecting plaintiffs to inferior working conditions, and implementing "official governmental policy" in a discriminatory manner. See Civil No. 07-1145 (DRD), Docket # 1, pp. 2-4, 6, 8. Likewise, the Plaintiffs in this case also allege that Cruz discriminated against them on account of their political affiliation. Specifically, they claim that Cruz fudged the performance evaluations for some of the Plaintiffs so that they reflected low scores and poor performance. These deficient evaluations were later used to justify the non-renewal of their contracts. See Docket # 29 at pp. 3-4.

On the second and third prongs, the Court must assume that ALB obtained confidential client information about all facts within the scope of the former representation, and then assess whether any of those facts are sufficiently similar such that "a lawyer would consider [them] useful in advancing the interests of the client" in this litigation. Starlight Sugar, 903 F. Supp. at 266. As mentioned above, the scope of the prior representation is set by the general "playbook" information that ALB gained during its representation of the Municipality and its officers throughout the years, including the Oquendo litigation.

As a preliminary matter, the Court finds that ALB's limited representation of the current municipal administration bears little, if any, relevance to this analysis. While Defendants contend that ALB provided a broad spectrum of services to the current NPP administration such that the latter would be in a position to gain disqualifying information from the current administration, this argument is unpersuasive. Defendants claim that ALB filed motions on behalf of the Municipality on various "active cases," had "telephone conversations with municipal employees," and "drafted letters and emails to opposing parties as well as to municipal employees

of the current administration." See Docket # 64. But all these activities took place during the administrative transition stemming from the Mayor's decision to terminate ALB as legal counsel. And, in any event, the representation in question lasted only for about a month. Given this context, any inference that these activities involved the transmission of confidential information that would give ALB an unfair advantage in this litigation withers substantially.

Defendants also argue, however, that ALB gained disqualifying information during the course of its lengthy representation of the previous administration. ALB parries this contention with Ramos Laboy v. Trujillo Panisse, 213 F. Supp. 2d 54, 57 (D.P.R. 2002), which stands for the sound proposition that in political discrimination cases, the core of the allegations "always center around the conduct of the people who run the Municipality, in other words, the municipal officers," rather than the abstract municipal entity itself. Cf. Valdez v. Pabey, No. 2:05-CV-255, 2005 WL 3556428, at *7 (N.D. Ind. Dec. 27, 2005) (observing that "[w]hile a city is a distinct legal entity apart from its governing administration, the fact that a city's strategies, agendas, policies and politics are tied to the governing administration cannot be ignored."). Once the municipal administration switched hands, ALB argues, the slate was wiped clean and any confidential information ALB had was gone with it. The problem, though, is that this case is distinguishable from Ramos and Valdez on two critical issues.

The first is that, since the administrations in Ramos belonged to different political parties, the court "[could] only conclude that they must also differ in their public policy." Id. Also, the discrimination in Ramos arose because the incoming mayor was specifically "attempting to correct the previous administration's illegal hiring practices." Ramos Laboy, 213 F. Supp. 2d at 58. Given the diametrically opposed political ideologies and the hostility displayed by the incoming mayor to the previous one's hiring practices, the Ramos court held that the previous administration's

policy had no relevance to the one employed by the current administration. But neither factor is present here.

From the perspective of the Plaintiffs in this case – some of which worked for the previous administration – the political hierarchy stayed constant through the transition. See Docket # 1, ¶ 3. It is certainly possible that the incoming and outgoing administrations may have had their differences. But for a case grounded on political discrimination, what truly matters is the political alignment of the players involved. Moreover, nothing on the record suggests that the current Mayor disagreed with the outgoing one concerning the latter's hiring practices, or, more generally, on the role political affiliation plays in these decisions. In a case like this, it is plausible to believe that at least some relevant municipal policies and procedures (including confidential documents and memoranda containing such details) survived the transition process.

The second distinguishing element lies in a similar vein. In the aforementioned cases, the people who occupied executive positions in the government – that is, those that "breathe life into the governmental unit" – were all replaced by the incoming administration. Valdez, 2005 WL 3556428 at *5. Here, however, at least one of the directors of the previous administration survived the transition: co-defendant Hiram Cruz. This is acutely problematic.

Recall that a conclusion about the possession of disqualifying information "may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." Model Rule 1.9, Cmt. 3. ALB does not dispute that, for many years, it provided a broad range of legal services to the Municipality. At the very least, the Court must assume that ALB was in a position to gain sensitive information from a high-level municipality official such as Cruz on matters relating to the Municipality's hiring practices and the potential existence of confidential information (including communications and memoranda) concerning the political affiliation of the

Municipality's employees.[3] Compounding this problem is that the previous administration's policies and procedures cannot be brushed away as irrelevant. Again, contrary to Ramos, it is not unreasonable to believe that some of these policies and procedures may have survived the transition. Finally, it is also possible that Cruz had previously shared confidences with ALB regarding the Plaintiffs in this case, since like Cruz, they also survived the transition (at least until their contracts expired).

It is impossible to know, for sure, whether any relevant confidential information survived the change in administration. Nevertheless, Defendants have proffered enough to raise serious doubts on this matter, which the Court must resolve in their favor. Madukwe, 552 F. Supp. 2d at 458. Furthermore, any lawyer worth his salt would consider this sort of "playbook" information useful to this case, even if it only serves to assist in targeting discovery. Thus, the Court finds that ALB's extensive representation of the previous administration, at the very least, placed it in a position to gain sensitive information that could be useful in litigating this case. Whether or not ALB actually gained such information is beside the point.

ALB's representation of the Municipality and its officers in the Oquendo case provides an even stronger basis for disqualification. Defendants stress that Oquendo was litigated on the merits; the parties conducted discovery and the district court issued an opinion granting Defendants' motion for summary judgment. This means, of course, that ALB was actually in a position to gain confidential information from the Municipality and its officers on all material issues surrounding that suit. The question is whether that information is substantially related to this case. The Court finds it is.

In a political discrimination case, the plaintiff must "produce sufficient direct or circumstantial evidence from which a jury" may reasonably infer that political discrimination "was a substantial or motivating factor behind [the] dismissal." Peguero–Moronta v. Gabriel Santiago, 464 F.3d 29, 45 (1st Cir. 2006). Thus, the Court

---

[3] The Court is loath to speculate. Nevertheless, this is a case in which the Mayor is accused with having performed a witch-hunt to extricate PDP supporters from the Municipality.

must assume that, both in this case and in Oquendo, the Municipality and its officers shared confidences with ALB concerning their knowledge of the plaintiffs' political affiliation and of the "motivating factors" behind the challenged employment decisions. Id. at 48.

The Court has already discussed how the presence of Cruz as an executive in both administrations weighs in favor of disqualification given that he may have shared confidential information regarding general municipal policies and procedures. But Cruz was ALB's client as well, and like in Oquendo, he is sued in both his personal and official capacities. Consequently, the Court must assume that Cruz shared confidential information with ALB that could relate to his defense in this case. During the course of the representation, Cruz could have revealed information concerning whether he actually or apparently harbored discriminatory animus against any of the Plaintiffs in this case (or the plaintiffs in Oquendo, or PDP supporters in general); his knowledge of Plaintiffs' political affiliation (and any methods used to identify them); and any policies and procedures he had implemented and maintained through the transition. Without question, this information is substantially related to this case. Further, for any litigator, this is potentially a treasure trove of information that could be used to tailor Plaintiffs' case.

Therefore, the Court holds that ALB's prior representation of the Municipality and its officers placed it in a position to gain confidential information that could be unfairly leveraged against the Defendants in this case.

Still, the analysis does not end with this determination, as the decision to disqualify lies within the discretion of the Court. Borges, 935 F.2d at 439 ("The standard of review of a district court's disqualification of counsel decision is abuse of discretion."). In deciding whether disqualification is the proper remedy, the Court must balance the "hardships to the client whose lawyer is sought to be disqualified against potential harm to the adversary should the attorney be permitted to proceed." Cendant Corp., 124 F.Supp.2d at 249. In a criminal case, this factor carries much weight since it

affects the defendant's Sixth Amendment's right to counsel. But when "choice of counsel and the protection of a privileged communication" square off in a civil case, the First Circuit has indicated that it leans "toward the protection of the communication." Kevlik, 724 F.2d at 848.

In this case, the equities clearly favor disqualification. Aside from the First Circuit's preference toward disqualification when confidential information is potentially involved, this case is still in its nascent stages. Discovery is stayed, and the Plaintiffs shall be provided time to find new counsel.[4]

### III.    Conclusion

ALB is henceforth disqualified from representing Plaintiffs in this case. Plaintiffs are hereby granted 45 days for their new legal representation to file their notice of appearance.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of January, 2017.

>                        *s/ Salvador E. Casellas*
>                        SALVADOR E. CASELLAS
>                        U.S. Senior District Judge

---

[4] As a final hail-Mary, ALB argues that disqualification in this case would also have the effect of unduly limiting the ability of ALB's attorneys to exercise their profession merely because they had provided services to the opposing parties in the past. The Court agrees with ALB that it is not "per se improper for a law firm to represent a party who is now adverse to a former client without a showing by the former client that the matters in the pending suit are 'substantially related' to the matters in which the attorney previously represented the party." See Docket # 57-1, p. 16 (citations and quotations omitted). But that is precisely what Defendants showed here. It is the particular facts of this situation, rather than any *per se* rule, that militates in favor of dismissal.